IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CHARLES JACKSON,　　　　　　　）
　　　　　　　　　　　　　　　　）
　　　　　Plaintiff,　　　　　　　）
　　　　　　　　　　　　　　　　）
vs.　　　　　　　　　　　　　　　）　　CASE NO. CV-00-TMP-1541-S
　　　　　　　　　　　　　　　　）
MERCEDES BENZ U.S.　　　　　　　）
INTERNATIONAL, INC.,　　　　　　）
　a Daimler Chrysler Company　　　）
　　　　　　　　　　　　　　　　）
　　　　　Defendant.　　　　　　　）

ENTERED

APR 16 2002

## MEMORANDUM OPINION

This action is before the court on a motion for summary judgment filed by defendant,

Mercedes Benz U.S. International, Inc., on September 28, 2001. The parties have consented

by stipulation to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C.

§ 636(c). The motion has been supported by a brief and evidence. Plaintiff filed a response

in opposition to the motion on December 17, 2001.[1]  Defendant filed a reply brief on

January 10, 2002.

### I.  Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[1]  On November 1, 2001, plaintiff filed a motion for an extension of time for filing a brief in opposition, which the court granted on December 13, 2001.



affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of

an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury

could reasonably find for the plaintiff.   Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).   Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. FACTS

Charles A. Jackson, the plaintiff, is an African American male.   He currently works for defendant Mercedes Benz U.S. International, Inc. ("MBUSI") as a production team member in the Quality Department.   He began working for MBUSI on  July 7, 1997, and was subsequently terminated on May 7, 1999, before being reinstated with full back pay after invoking defendant's peer review process.

### A. Job Chronology

Plaintiff was hired by MBUSI as a production team member in the Quality Department on July 7, 1997.   In February 1998, plaintiff applied for an assembly maintenance position through defendant's self-nominating process. Plaintiff was notified by letter that his experience and/or technical background did not fulfill the qualifications of the position at that time. (Jesse Scott's  March 1998 letter to plaintiff).  In January 1999,

4

plaintiff was interviewed for a maintenance position in the Paint Department. The position ultimately was awarded to Howard Leopold, a Caucasian male, whom plaintiff admits was as qualified as the plaintiff for the position.    After learning that he did not receive the promotion, plaintiff used the company's concerns resolution process. Plaintiff ultimately met with Bill Bugg, manager of the Paint Shop. In that meeting, plaintiff stated that Bugg told plaintiff that Leopold was selected because he had water treatment experience. Plaintiff admittedly does not and did not have such experience. Bugg approved the selection of Leopold because he believed he was the best qualified for the position.

### B. Discipline Chronology

In November 1997, plaintiff received a Corrective Action Report Type I due to three tardies within a period of 103 days. MBUSI policy states that three late occurrences in 180 days will result in Corrective Action Type 1. (See MBUSI Team Member Handbook). On July 23, 1998, plaintiff received a Corrective Action Report (counseling) for a confrontation with Bruce Kincaid, another team member. Both plaintiff and Kincaid received a counseling report for this incident.

On Tuesday evening, April 27, 1999, Melissa Harbison, a group leader for the Quality Audit Department on the evening shift, attempted to locate all the Audit Team Members. Harbison was able to locate all team members but the plaintiff. After attempting to locate the plaintiff herself, she contacted his team leader, Pat Cox, who is African-American.  Harbison and Cox looked for plaintiff and paged him over the intercom several

5

times. Harbison and Cox searched through several vehicles located in a storage lot outside the physical facility of the Audit Area roll-up door. When Cox opened the rear driver's side door of one of the vehicles, he saw plaintiff sitting in the back seat. The lights inside the vehicle were on, although this is disputed by Cox. When Cox asked plaintiff what he was doing, plaintiff exited the car and walked away without responding. Harbison reported this incident to the nighttime assistant manager, Edward Pugh, who also is African-American. Harbison told Pugh that she believed plaintiff was sleeping on the job. At the time plaintiff was located, he had been unaccounted for from approximately 11:30 p.m. until 1:26 a.m.

When confronted later that shift in a meeting with Harbison and Pugh, plaintiff said he had been conducting audits during the two hours he was missing. After plaintiff was sent home for the remainder of the shift, he realized that he actually was performing duties other than audits. Production records for the vehicles involved showed that the audits were performed before the lunch break and plaintiff was missing after the lunch break. The next night, April 28, plaintiff was summoned to another meeting, where he volunteered that his explanation of the night before was an error, and he offered the alternative explanation that he had been looking for a piece of equipment. Further investigation by Pugh failed to turn up any evidence or witnesses that could corroborate that plaintiff was in the plant during the time in question. Plaintiff was summoned to a third meeting on May 3, 1999, and asked to explain his whereabouts during the missing two hours. When he was not allowed to tape-record the meeting, he refused to comment and was sent back to work.

6

Pugh met with Greg Kimble, Manager of Team Relations, who also is African-American. Pugh recommended that plaintiff be terminated, and Kimble agreed with this recommendation. As a result, Pugh and Kimble met with plaintiff on May 7, 1999, and plaintiff received a Level III Corrective Performance Review Report for interfering with plant efficiency and productivity for sleeping or hiding with the intent to sleep during working hours. His employment was terminated.

After his termination, plaintiff decided to invoke the peer review process provided by defendant. The Peer Review Panel determines whether a team member's termination should be affirmed or reversed, but the panel does not determine if the team member violated company policy or should be otherwise disciplined. In the event the Peer Review Panel reinstates a team member, it is the company's decision to determine the level of discipline to impose. The Peer Review Panel decided to reinstate plaintiff, and he was subsequently issued a Level III Corrective Action Report due to violation of company policy. Plaintiff was reinstated with full back pay to the Quality Department in the Section Product Audit Team on June 16, 1999, but to a different shift so he would not work for the same Group Leader. Due to shift rotation at MBUSI, this switch did not change the hours plaintiff worked. Although he was paid full back pay based on forty hours per week of work, plaintiff was not paid any "back overtime" because he had not worked any overtime during the period between May 7 and June 16. Prior to his termination, he had averaged

between 5 to 10 hours of "mandatory" overtime per week. Plaintiff made more money after reinstatement because more overtime work was available.

On May 31, 2000, the plaintiff received another disciplinary action in the form of a Corrective Performance Review Report Level I due to "unauthorized time from work station or area." On this occasion, plaintiff was accused of following a tour of company guests and failing to return to his work assignment after being instructed to do so. Plaintiff commented in response to this report that he was utilizing defendant's "open door policy" in trying to speak to one of the guests on the tour about his problems with defendant. He also contends that he did not disobey any direction to go back to work. Plaintiff did not lose any pay or other benefits as a result of this disciplinary report.

### C. Plaintiff's Claims

On March 23, 1999, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that he had been discriminated against by the defendant because of his race in regard to promotions. On March 28, 2000, the EEOC issued plaintiff a notice of right to sue and terminated its processing of his charge. Following his discharge on May 7, 1999, and while his first charge was pending, plaintiff filed his second EEOC charge of discrimination, claiming that he was terminated because of his race and in retaliation for having previously filed a charge of discrimination. On March 31, 2000, the EEOC terminated its processing of plaintiff's charge and issued plaintiff a notice of right to sue. Additionally, while both charges of discrimination were

pending in the EEOC, plaintiff filed, on May 17, 1999, an unfair labor practice charge with

the National Labor Relations Board against MBUSI. In that complaint, plaintiff made a

sworn statement that "on or about May 7, 1999, the above-named Employer, through its

officers, agents and representatives, discharged Charles Jackson **because of his involvement**

**in an initial organizing campaign with the United Autoworkers of America**." (Bolding

added). After investigating, the NLRB concluded:

> As a result of the investigation, it does not appear that further proceedings are
> warranted in the above-referenced case. Your charge alleges that the employer
> discharged you on May 7, 1999 in retaliation for your Union activities.
> However, the investigation failed to disclose any evidence to show that your
> Union activities were a motivating factor in the employer's decision. The
> investigation disclosed that on April 28, 1999, Team Leader Patrick Cox
> discovered you in the back seat of a vehicle outside the plant at about 1:26
> a.m. The investigation further disclosed that, when asked about your
> whereabouts from 11:30 p.m. until that time, you initially claimed that you had
> performed audits from 11:30 p.m. until after 12:00 midnight. The
> investigation disclosed that you did not perform any audits after 10:45 p.m.,
> a fact the employer confirmed by comparing the audit records you completed
> that evening to the production records for the vehicles you audited. The
> investigation further disclosed that on or about May 3, 1999 you refused to
> answer any questions posed by the Human Resources Managers investigating
> the matter unless they would permit you to tape record the interview.
> Although you claim that the employer had tolerated other employees who
> allegedly slept on the job, those incidents did not involve misrepresentations
> by those employees about their activities, or refusals by those employees to
> answer questions about the incident concerned. For the reasons stated above,
> I am refusing to issue a complaint in this matter.

A year later, plaintiff filed his second unfair labor practice charge with the NLRB on

or about May 29, 2000, which he amended on June 1, 2000.  On October 25, 2000, the

NLRB dismissed the complaint due to lack of cooperation by the plaintiff.  While that charge was still pending before the NLRB, on June 5, 2000, plaintiff filed the complaint commencing this action.

In his brief in opposition to summary judgment, Jackson asserts two claims against MBUSI: (1) that he was improperly denied the promotion to the maintenance position in the paint shop in January 1999 because of his race; and (2) that he was terminated because of his race and in retaliation for the previous charge of discrimination filed with the EEOC claims.  Both claims of race discrimination are analyzed under disparate treatment standards.

### III. DISCUSSION

#### Disparate Treatment in Promotion

In early 1999, plaintiff sought a promotion to a Maintenance position in the Paint shop.  Plaintiff admitted that his qualifications for the position were equal to Howard Leopold, who was selected for the position.  Plaintiff admits summary judgment on this count should be granted due to the current law in the Eleventh Circuit regarding discrimination in promotion cases, in particular *Alexander v. Fulton County,* 207 F.3d 1303, 1340 (11th Cir. 2000).  (See Plaintiff's Reply Brief to Defendant's Motion for Summary Judgment, page 2).  Consequently, summary judgment will be granted on this allegation.

10

## Discriminatory and Retaliatory Discharge

MBUSI bases its motion for summary judgment on plaintiff's discharge claim on three grounds: (1) that plaintiff is judicially estopped from asserting that he was discharged because of his race or in retaliation for having filed a charge of discrimination; (2) that plaintiff cannot establish that he was discharged because of his race; and (3) that plaintiff cannot establish that he was discharged in retaliation for filing a charge of discrimination.

### 1. Judicial Estoppel

The defendant asserts that due to plaintiff's previous sworn statements before the National Labor Relations Board, claiming that he was terminated due to his involvement with union activities, plaintiff should be judicially estopped from asserting that he was terminated because of his race and in retaliation for filing an EEOC charge. Plaintiff alleges that he was terminated on May 7, 1999, because of his race and in retaliation for having previously filed a charge of discrimination with the EEOC. A mere ten days after the discharge, Plaintiff filed a charge with the National Labor Relations Board (NLRB), claiming that his termination was due to his involvement in an initial organizing campaign with the United Autoworkers of America, and made a sworn statement to this effect. Defendant argues that this sworn allegation before the NLRB now estops Plaintiff from asserting a different reason for his termination.

The Eleventh Circuit has maintained that "[j]udicial estoppel is applied to the calculated assertion of divergent sworn positions." McKinnon v. Blue Cross and Blue Shield

of Alabama, 935 F.2d 1187, 1192 (11th Cir. 1991) (citing American National Bank v. Federal Deposit Ins. Corp., 710 F.2d 1528, 1536 (11th Cir. 1983)). The doctrine of judicial estoppel should be applied when the following are met: first, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding and, second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system. Salomon Smith Barney, Inc. v. Harvey, 260 F.3d 1302, 1308 (11th Cir. 2001). "The doctrine of judicial estoppel applies even where the party made the prior inconsistent statements in an administrative forum." Alabama v. Shalala, 124 F. Supp.2d 1250, 1266 (M.D. Ala. 2000).

The doctrine of judicial estoppel was applied by the District Court for the Northern District of Alabama in Chandler v. Samford University, 35 F. Supp. 2d 861, 864 (N.D. Ala. 1999), in which it was determined that the plaintiff should be judicially estopped from pursuing her Title VII claim, because plaintiff failed to disclose her potential discrimination claim against Samford University in her bankruptcy proceeding. Therefore, the court found that she was taking a position that was incompatible with the one she presented before the bankruptcy court and should be judicially estopped from asserting divergent positions.

Plaintiff analogizes his case with ADA/ Social Security cases such as Taylor v. Food World, Inc., 133 F.3d 1419 (11th Cir. 1998). In Taylor, the court determined that judicial estoppel could not be applied on a per se basis when an individual asserting an ADA case had previously filed a claim for disability benefits with the Social Security Administration

12

(SSA). The court reasoned that the SSA in determining whether an individual is entitled to disability benefits does not take into account the effect of reasonable accommodations on an individual's ability to work. Id at 423. The court found that these are not necessarily incompatible positions and must be examined on a case by case basis to determine whether judicial estoppel is appropriate.

The court agrees with plaintiff that judicial estoppel does not bar suit here. Plaintiff filed an unfair labor practice charge with the NLRB, asserting that his termination was due to his involvement in an organizing campaign with the union. Later, he took the position in the complaint in this action that he was terminated because of his race and in retaliation for his EEOC claims. These are not necessarily inconsistent positions, given the divergent contexts in which they were asserted. Plaintiff's statement to the NLRB that he was fired due to union activities does not exclude the possibility that his termination was the product of mixed motives, involving both retaliation for his organizing activities **and** discrimination due to his race and in retaliation for his charge of discrimination with the EEOC. Before the NLRB, the only motive for the termination relevant to the proceeding was plaintiff's organizing activities; the NLRB had no authority to correct a racially discriminatory or retaliatory firing. Those allegations were simply irrelevant to the NLRB proceedings and, thus, it is not surprising that they were not asserted there. The fact that the charge in the NLRB proceeding does not include a race discrimination/retaliation claim, which is exclusively in the province of the EEOC, does not estop plaintiff from contending now that

13

other, additionally illegal reasons motivated Defendant to terminate his employment.
Accordingly, plaintiff is not judicially estopped from asserting that position in this case.

### 2. Discriminatory Discharge

Plaintiff alleges he was discharged discriminatorily due to his race. According to the Supreme Court, "liability depends on whether the protected trait... actually motivated the employer's decision," Reeves v. Sanderson Plumbing Products, Inc. 530 U.S. 133, 120 S. Ct. 2097, 2105 (2000), citing Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993)). "Proof of discriminatory motive is critical, although it can sometimes be inferred from the mere fact of difference in treatment." International Bd. Of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).

Under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff can establish a *prima facie* case of discriminatory discipline by showing the following: (1) that he is a member of a protected class; (2) that he was qualified for the position at issue; (3) that adverse employment action was taken against him; and (4) that the employer treated similarly situated employees outside the protected class more favorably. On this latter element, the plaintiff has the burden of showing that similarly situated employees outside his protected class were treated more favorably. "[T]he comparator's misconduct must be nearly identical to the plaintiff's in order 'to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges.'" Silvera v. Orange

County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001) (quoting Maniccia, 171 F.3d at 1368-69).

If plaintiff establishes a *prima facie* case of discriminatory action, the defendant has the burden of producing evidence that the allegedly adverse action was made for "legitimate, nondiscriminatory reasons." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 522 U.S. 1045 (1998). If the defendant rebuts the presumption of discriminatory action with legitimate, nondiscriminatory reasons, then the presumption of discrimination arising from plaintiff's prima facie case "drops" and "the factual inquiry proceeds to a new level of specificity." Id (citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981)). To survive summary judgment at this stage of the inquiry, the plaintiff must present "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext." Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990). The plaintiff must establish evidence from which a reasonable trier of fact would disbelieve rather than disagree with the employer's proffered reasons. Combs, 106 F.3d at 1543.

In this case, there is no question that plaintiff is a member of a protected class of African-Americans, and there is no dispute that he was qualified for the job he held before his termination on May 7, 1999. The third and fourth elements of the *prima facie* showing, however, are not so clear cut. While it is true that plaintiff was terminated on May 7, 1999, he was subsequently reinstated to the job with full back pay (excluding overtime) on

15

June 16, 1999. Thus, the legal issue is whether under these circumstances, plaintiff actually suffered "an adverse employment action." Also, the evidence relating to plaintiff's similarity to other employees not disciplined as harshly as plaintiff for the same infraction is not compelling. The court will address these two elements of plaintiff's *prima facie* showing separately below.

Defendant argues that because plaintiff's termination on May 7, 1999, ultimately was rescinded, effective June 16, 1999, and plaintiff was paid full back pay (but not overtime), he has suffered no "adverse employment action" for purposes of a *prima facie* case. MBUSI cites <u>Pennington v. City of Huntsville</u>, 261 F.3d 1262 (11th Cir. 2001), for the proposition that potential "adverse employment actions" promptly rescinded and for which the employee suffers no "tangible harm" fail to establish that element of the plaintiff's *prima facie* case. <u>See, also</u>, <u>DeLandro v. Jackson Memorial Hosp.</u>, 2001 WL 1622064 (S.D. Fla. 2001) (termination rescinded with full back pay not an "adverse employment action"). In response, plaintiff contends that he has suffered tangible harm in the form of lost overtime pay he would have earned but for the rescinded termination.

The Eleventh Circuit explained in <u>Pennington,</u> in *dicta*, the following:

> The caselaw in this area indicates that the decision to reprimand or transfer an employee, if rescinded before the employee suffers a tangible harm, is not an adverse employment action. <u>See</u> <u>Breaux v. City of Garland,</u> 205 F.3d 150, 158 (5th Cir. 2000); <u>Dennis v. County of Fairfax,</u> 55 F.3d 151, 156 (4th Cir. 1995); <u>Blalock v. Dale County Bd. of Educ.</u>, 84 F.Supp.2d 1291, 1311 (M.D. Ala. 1999). But when an employee loses pay or an employment benefit from

16

a delayed promotion, courts have held that the employment action is not adverse only when the action is rescinded and backpay is awarded. See Dobbs-Weinstein v. Vanderbilt University, 185 F.3d 542, 544 (6th Cir.1999); Benningfield v. City of Houston, 157 F.3d 369, 378 (5th Cir. 1998); see also Miller v. Federal Express Corp., 56 F.Supp.2d 955, 960 (W.D.Tenn. 1999) (rescinding termination did not render action non-adverse in part because plaintiff lost five days of pay and bonuses).

Pennington v. City of Huntsville, 261 F.3d 1262, 1267-68 (11th Cir. 2001). Ultimately, the holding in Pennington was that the plaintiff failed to refute the legitimate, non-discriminatory reason for the employment decision articulated by the employer. Thus, the court of appeals assumed that a *prima facie* case had been made out by the plaintiff, rendering the foregoing passage *dicta*. In any event, under the facts of the instant case, it cannot be said that plaintiff suffered no tangible harm. He has testified that he lost the opportunity to work and be paid for "mandatory" overtime of between five and ten hours per week for each of the six weeks he missed. Although the court recognizes that the opportunity to earn overtime may be somewhat speculative, plaintiff has presented sufficient evidence here to show that working overtime was a reasonable, if not "mandatory" expectation. The court does not believe that Pennington precludes the plaintiff from proving a *prima facie* case. Consequently, having suffered a termination, albeit later rescinded by the peer review panel, plaintiff does meet the third element of the McDonnell Douglas *prima facie* case.

17

On the fourth element of a *prima facie* case, plaintiff offers evidence that white employees have been accused of sleeping on the job, but were not terminated as he was. The plaintiff argues the following employees were treated more favorably: Robert Hamilton, Wynn Elliott, Donny Tucker, Joe Rowell, and Cindy Dillard.  The undisputed admissible evidence as to each shows the following:

**Robert Hamilton** -- After Christmas 1998, Sarah Orr, a Team Member in the Repair Group, saw Robert Hamilton sleeping on the job one evening. She said he did so again the following evening. She said that he was sitting in a car across the car wash from her with his head reclined. Pat Cox, an African-American Team Leader for another group, walked by and saw Hamilton. He testified:

> I reported it to Melissa Harbison, and what I told her was that I found him reclined in a vehicle. I approached the vehicle, he was awake when I approached it. I questioned him about what was going on. He said he had been sick, and I directed him that he needed to go to Medical if he was sick. And he exited the vehicle, and I reported it to Melissa.

(Cox Depo., pp. 9-10).  Hamilton himself testified by affidavit, that he was ill during the time period after Christmas 1999, was not sleeping, and was sent home where he was treated for the flu.  (Hamilton Aff. ¶ 3).

Orr complained to the Production Manager about Hamilton allegedly sleeping on the job. A Team Relations Representative investigated Orr's complaint. Hamilton denied that

he was sleeping on the job, and no other Team Members supported Orr's contention. As a result, the Company did not take any further action on the matter.

**Wynn Elliott**-- Plaintiff testified there were *rumors* that Ed Pugh had caught Wynn Elliott sleeping on the job.  There is no evidence of Wynn Elliott sleeping on the job, nor any evidence that Ed Pugh told anyone that Wynn Elliott was sleeping on the job. This charge consists of unsubstantiated rumors.  Both Pugh and Elliott have testified by affidavit that Pugh never discovered Elliott sleeping or remarked such to anyone else.

**Donnie Tucker and Joe Rowell** -- Plaintiff contends that two members of the Quality Audit Group were missing from the job and did not get disciplined. Their group leader, Melissa Harbison, could not locate them for a period of time. They voluntarily presented themselves and immediately provided a reasonable explanation of their whereabouts. They were performing a normal job duty, which required them to be at the marshaling yard. This explanation raised no suspicion that they had been sleeping, missing from their job, or in any way not performing their regular job duties.

**Cindy Dillard**— Plaintiff asserts that Cindy Dillard was caught sleeping on the job and was not terminated. Dillard, a white female, was charged with sleeping on the job sometime after the incident involving plaintiff. At that time, Dillard was issued a Level III Corrective Performance Review. MBUSI contends that, since plaintiff's reinstatement by the Peer Review Panel, it has been their consistent policy to issue Level III discipline to

19

Team Members found sleeping on the job with prior clean records. This is the same level of discipline plaintiff ultimately received when reinstated by the peer review panel.

Plainly, Elliott, Tucker, and Rowell are not proper comparators to plaintiff because there simply is no evidence that defendant ever believed or accused these workers of sleeping on the job. Whether or not plaintiff was actually sleeping when discovered by Cox in the back seat of a car, it is clear sufficient circumstances existed to cause the defendant to be suspicious that he was: missing for almost two hours, failed to respond to several pages over the intercom system, and found in the backseat of a car in the dark storage lot outside the audit area with no apparent explanation for his actions. Likewise, Hamilton is not a proper comparator because, although found in a car, he proved to be ill, explaining his conduct. Finally, while it appears that Dillard was discovered sleeping on the job, she was treated, ultimately, to the same disciplinary action as the plaintiff, a Level III Corrective Performance Review, because that was the precedent set earlier in plaintiff's case by the Peer Review Panel. Thus, Dillard was not treated more favorably than plaintiff.

In sum, plaintiff cannot establish the fourth element of his *prima facie* case. None of the so-called comparators were either properly comparable to plaintiff or treated any more favorably than he. Thus, failing to establish a *prima facie* case, plaintiff's claim of racially discriminatory termination is due to be dismissed.

Even if the court concluded that plaintiff had established a *prima facie* case, the defendant has articulated a legitimate, non-discriminatory reason for plaintiff's termination,

which he has failed to refute. To refute the articulated reason, plaintiff must come forward with evidence from which a reasonable factfinder could conclude that the reason is not the true reason for the termination, and that the real reason was racial discrimination.

Defendant contends that plaintiff was terminated because it was believed that he was sleeping on the job *and* because his explanations of his actions indicated deceitfulness and lack of cooperation with the investigation. (See Dep. of Ed Pugh, pp 26-27). It is undisputed that plaintiff could not be found by his supervisors for almost two hours during the night shift on April 27, 1999, and that his subsequent explanations proved either to be implausible or incapable of corroboration. Finally, on a third effort to hear plaintiff's explanation for the events of the evening, he refused to cooperate entirely, saying "do what you got to do." Plaintiff has offered no evidence to suggest that the decisionmakers, Pugh and Kimble, both African-American, did not actually believe their stated reason for terminating plaintiff or that it was otherwise unworthy of credence. The articulated reason that plaintiff was fired for sleeping on the job and being deceitful and uncooperative in his explanations remains unrefuted. The so-called comparators are not true comparators at all, and there is no other evidence from which an inference of discrimination can be drawn. Because plaintiff has failed to introduce evidence from which a reasonable trier of fact would *disbelieve* the defendant's reasons for firing plaintiff rather than merely *disagreeing* with them, summary judgment is appropriate on the issue of discriminatory discharge.

### 3. Retaliatory Discharge

Plaintiff claims also that his May 7, 1999, termination was in retaliation for having filed his earlier charge of discrimination with the EEOC. On March 23, 1999, plaintiff filed his first charge of discrimination (130991708) with the EEOC, in which he contended that he had not secured the promotion to Maintenance Team Member because of his race. On March 28, 2000, the EEOC terminated its processing of plaintiffs charge and issued a Notice of Right to Sue.

Plaintiff claims his discharge was in retaliation to his first EEOC complaint. In plaintiff's first EEOC complaint, he claimed discrimination in promotion because of his race. To establish a prima facie case of retaliatory discharge, plaintiff must offer evidence on three elements:

> "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." Olmsted v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998) (citing Meeks v. Computer Associates Int'l, 15 F.3d 1013, 1021 (11th Cir. 1994)). The causal link element is construed broadly so that "'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" Olmsted, 141 F.3d at 1460 (quoting E.E.O.C. v. Reichhold Chem., Inc, 988 F.2d 1564, 1571-72 (11th Cir.1993)).

Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001). Once the plaintiff has done so, the defendant employer "then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action." Id., citing Olmsted, 141 F.3d

22

at 1460; Meeks, 15 F.3d at 1021. "The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff." Id citing Olmsted, 141 F.3d at 1460.

The court will assume here, for the reasons already expressed above, that plaintiff meets the burden of showing a prima facie case. He filed an EEOC charge of discrimination concerning promotions in March 1999, which is a protected activity; he was terminated, albeit temporarily on May 7, 1999, which is an "adverse employment action"; and, given the relative closeness in time between the two events, plaintiff has shown that they are not completely unrelated. As discussed above, defendant has articulated a legitimate, non-discriminatory reason for the termination, and, again, plaintiff has failed to present any evidence from which a factfinder could infer that it was not the true reason, but a mere pretext to retaliate for the filing of the charge. For the reasons already mentioned, plaintiff has offered no evidence that suggests that Pugh's and Kimble's articulated reason for terminating him was not their true reason. The comparisons to other employees being more favorably treated do not hold up, and the circumstances of the accusation against plaintiff and the investigation of it are undisputed. He was indeed missing for two hours, did not respond to pages, was found under circumstances making his supervisors suspicious that he was sleeping, and was evasive and uncooperative during the investigation. There simply is nothing to show that the articulated reason is not worthy of belief or is not the true reason for his termination. Defendant is entitled to summary judgment on this claim also.

23

Based on the foregoing considerations, the defendant's motion for summary judgment will be granted.  A separate order will be entered.

DONE this ___16th___ day of April, 2002.


T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE